**Nita Klunder**
**David D'Addio***
**Attorneys for the Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**Boston Regional Office**
**33 Arch Street, 24th Floor**
**Boston, MA 02110**
**617-573-8822 (Nita Klunder)**
***Not admitted in the U.S. District Court for the Eastern District of New York**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>     **v.**<br><br>**MATTHEW NICOSIA,**<br>**WILLIAM ("ROCKY") REININGER,**<br>**FABRIZIO DI CARLO, and**<br>**RONALD TOUCHARD,**<br><br>                              **Defendants.** | **Civil Action No. 22-CV-____ (___)**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against the defendants:

**SUMMARY**

1.      This is a securities fraud enforcement action.  Defendants Matthew Nicosia, William ("Rocky") Reininger, Fabrizio Di Carlo, and Ronald Touchard engaged in fraudulent schemes to sell publicly traded stock to retail investors.  From not later than August 2019 through at least September 2020 (the "Relevant Period"), the defendants, acting in concert with others, schemed to fraudulently sell penny stocks of one or more of the following companies to

investors in the public United States securities markets: Odyssey Group International, Inc. ("Odyssey"), Scepter Holdings, Inc. ("Scepter"), and CannaPharmaRx, Inc. ("CannaPharmaRx").

2.      Depending on the security at issue, Reininger and/or Nicosia concealed their control of the companies in which they sold shares, along with their control of nearly all of the stock that was deposited with brokerage firms and available for public trading (the "float") for each of these securities. They hid their control, in part, by arranging for an intermediary to acquire and sell shares on their behalf without registering the sales or complying with legally mandated sale limitations. To liquidate their shares, Reininger and Nicosia funded deceptive promotional campaigns, enabling them to artificially generate enough demand for their shares while concealing from prospective purchasers that the stocks were being sold, in bulk, by people who controlled the companies.

3.      With respect to Odyssey, by August 2019, Nicosia, Reininger, and an individual sued in a separate Commission action, Charlie Abujudeh, agreed to have Abujudeh purchase 2.5 million shares from one of Nicosia's associates on their behalf. The 2.5 million shares constituted about 98 percent of the Odyssey float. Nicosia and Reininger, who were both significant shareholders of Odyssey and were involved in the management and operations of the company, tasked Abujudeh with hiring stock promoters to tout Odyssey to potential investors over the phone. The three agreed that Abujudeh would sell their 2.5 million Odyssey shares once the promotion they were funding was underway (sometimes referred to as selling the shares "into" a stock promotion) and split the profits.

4.      Defendant Touchard introduced Abujudeh to defendant Di Carlo, who ran a stock promotion organization that called itself "Investor's Quarterly" and used high-pressure and

deceptive tactics targeting unsuspecting retail investors. Abujudeh, working on behalf of Nicosia and Reininger, hired Di Carlo to promote Odyssey shares to potential investors, primarily by phone. They agreed that Di Carlo would earn a 30 percent commission on all sales generated by his organization (which Abujudeh and Touchard referred to as a "phone room"); Touchard and his business partner would each earn a 2.5 percent commission on those sales; and Nicosia, Reininger, and Abujudeh would split the profits, with half going to Abujudeh, and half to Nicosia and Reininger.

5. Di Carlo and his "Investor's Quarterly" associates began soliciting investors to buy Odyssey shares in or around January 2020. Defendants Nicosia, Reininger, and Touchard knew or were reckless in not knowing that Di Carlo and his organization engaged in deceptive conduct in promoting Odyssey shares, including by making false and misleading statements to investors, and concealing material facts regarding, among other things: Abujudeh, Nicosia, and Reininger's control of nearly the entire Odyssey float; their control over at least 17 percent of the total outstanding shares of Odyssey; Nicosia and Reininger's involvement in Odyssey's management and operations; Nicosia, Reininger, and Abujudeh's funding of the phone room; their intention to sell Odyssey shares into the demand the phone room generated; their coordination of the promotional campaign; and their plan to share the profits from their Odyssey stock sales.

6. Using these deceptive tactics, Di Carlo's phone room convinced unwitting investors to purchase thousands of shares of Odyssey stock. The volume of trading (i.e., the total number of shares being traded), however, failed to meet the expectations of Nicosia, Reininger, Abujudeh, and Touchard. So they fired Di Carlo and hired an individual whom they believed ran a different phone room based in Colombia that was capable of convincing investors to purchase

hundreds of thousands of shares per week. Touchard introduced Abujudeh to the individual supposedly running the Colombian phone room. Abujudeh and defendants Nicosia, Reininger, and Touchard were unaware, however, that the individual they were attempting to hire was, in fact, a cooperating witness ("CW") who was working undercover on behalf of the Federal Bureau of Investigation ("FBI"). The CW recorded numerous phone calls and captured numerous encrypted text communications with Touchard and Abujudeh. On behalf of himself, Nicosia, and Reininger, Abujudeh agreed to pay the CW a 35 percent commission on Odyssey purchases that the CW generated through his phone room.

7.      Ultimately, Nicosia, Reininger, Abujudeh, and Touchard were unable to hire the CW because neither the CW nor the FBI was actually running a phone room to promote penny stocks. So Nicosia, Reininger, and Abujudeh instead funded and controlled an email and web-based promotional campaign (a "digital" promotional campaign) touting Odyssey stock to investors.

8.      Their digital campaign, like their phone room, was part of their deceptive scheme to sell Odyssey shares. The digital promotions carried various disclaimers, but failed to disclose material information, just as the phone room had done.

9.      The deceptive phone and digital promotional campaigns were successful. In all, Nicosia, Reininger, and Abujudeh generated approximately $2.6 million in illicit proceeds by selling Odyssey stock through Abujudeh to investors during the promotional campaigns. Abujudeh distributed proceeds from those sales to himself and each of the Defendants.

10.     Nicosia and Reininger's scheme to sell shares of Scepter and CannaPharmaRx operated in a similar manner. As to Scepter, Nicosia, Reininger, and Abujudeh controlled over 60 percent of Scepter's total outstanding shares and over 87 percent of Scepter's float. Nicosia

also regularly advised Scepter's chief executive officer about business development and corporate matters. Nicosia, Reininger, and Abujudeh were therefore affiliates of Scepter. Nicosia and Reininger arranged for Abujudeh to acquire Scepter shares and, by using Abujudeh as an intermediary, they sold shares into the market through Abujudeh without registering those sales or complying with legally mandated sale limitations, all while concealing from prospective purchasers that Scepter's stock was being sold, in bulk, by people who controlled the company. To generate demand for their shares, Nicosia, Reininger, and Abujudeh secretly funded a digital promotional campaign touting Scepter's stock, and they sold their shares through Abujudeh into that artificially generated demand. The digital campaign was similar to the digital campaign touting Odyssey shares, described above. The digital campaign touted Scepter without revealing that people who controlled the company were funding the campaign and dumping their shares into the demand it generated. Abujudeh, Reininger, and Nicosia agreed to split the profits on approximately $3.2 million in gross sales of Scepter shares.

11.     For CannaPharmaRx shares, the scheme operated in a similar way, except that Nicosia and Abujudeh agreed to split the profits between themselves, leaving Reininger out of the deal. Nicosia was a CannaPharmaRx board member and the company's largest shareholder. He arranged for Abujudeh to purchase 3,125,000 CannaPharmaRx shares from a third party affiliated with CannaPharmRx's CEO. Through Abujudeh, Nicosia controlled the vast majority of the CannaPharmaRx float. By arranging for Abujudeh to acquire these shares and sell them on Nicosia's behalf, Nicosia profited from the sale of $3.3 million worth of CannaPharmaRx shares, again without registering the sales or complying with legally mandated sale limitations. To generate demand for these shares, Nicosia and Abujudeh funded yet another deceptive digital campaign like those described above that touted CannaPharmaRx stock while concealing from

investors the fact that an individual who controlled the company was dumping shares into a promotion he was funding.

12.     At the time that Abujudeh sold Odyssey, Scepter, and CannaPharmaRx stock on behalf of himself, Reininger, and/or Nicosia, there was no registration statement for those sales on file with the Commission or in effect as to those transactions, as required by the relevant securities laws described herein.  No exemption from the registration requirement applied.

## VIOLATIONS

13.     As a result of the conduct alleged herein, Nicosia, Reininger, Di Carlo, and Touchard, violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77q(a)(1), (3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §240.10b-5(a), (c)].

14.     In addition, as a result of the conduct alleged herein, Nicosia and Reininger violated, and unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§77e(a), (c)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

15.     The Commission seeks a permanent injunction against the Defendants, enjoining them from engaging in transactions, acts, practices, and courses of business of the type alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest; civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; an order barring the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. §77t(g)] and/or 21(d) of the Exchange

Act [15 U.S.C. §78u(d)]; an order prohibiting defendants Nicosia and Reininger from acting as

an officer or director of any issuer that has a class of securities registered pursuant to Section 12

of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section

15(d) of the Exchange Act [15 U.SC. § 78o(d)]; and such other relief as the Court may deem

appropriate.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. §77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15

U.S.C. §§78u(d), 78u(e), and 78aa].

17.     Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C.

§77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Certain of the acts, practices,

transactions and courses of business alleged in this Complaint occurred within the Eastern

District of New York, and were effected, directly or indirectly, by making use of means or

instrumentalities of transportation or communication in interstate commerce, or the mails.  For

example, several individuals residing in the Eastern District of New York purchased Odyssey,

Scepter, and CannaPharmaRx stock during deceptive promotional campaigns conducted during

the Relevant Period.  In addition, Abujudeh, on behalf of himself, Reininger, and Nicosia, made

payments to an entity located in the Eastern District of New York in furtherance of their scheme.

## DEFENDANTS

18.     Matthew Nicosia, age 48, is a Utah resident.

19.     William "Rocky" Reininger, age 53, is a California resident.

20.     Fabrizio Di Carlo, age 46, is a Canadian citizen who resides in Quebec.

21.     Ronald Touchard, age 63, is a California resident.

## RELATED INDIVIDUALS AND ENTITIES

22.     Charlie Abujudeh, age 48, is California resident.  The Commission sued Abujudeh for his role in the violations of securities laws described herein.  *See SEC v. Charlie Abujudeh*, 21-cv-04110-PKC (E.D.N.Y. 2021).  In a parallel criminal case, Abujudeh pleaded guilty to one count of conspiracy to commit securities fraud in violation of 18 U.S.C. §371 for his role in the promotion and sale of Odyssey stock.  *See United States v. Charlie Zaki Abujudeh*, 22-cr-00161 (E.D.N.Y. 2022).

23.     Investor 1, age 51, is a California resident.  Stock promoters hired directly or indirectly by Nicosia, Reininger, Abujudeh, Touchard, and Di Carlo used deceptive tactics to persuade Investor 1 to buy Odyssey shares.

24.     Investor 2, age 62, is an Oklahoma resident.  Stock promoters hired directly or indirectly by Nicosia, Reininger, Abujudeh, Touchard, and Di Carlo used deceptive tactics to persuade Investor 2 to buy Odyssey shares.

25.     Odyssey Group International, Inc. describes itself as being primarily "in the business of surgical & medical instruments & apparatus" and in the "development and acquisition of medical products and health related technologies."  Odyssey (stock ticker symbol: ODYY) trades on OTC Link (previously, the "Pink Sheets"), operated by OTC Markets Group, Inc.  Odyssey was incorporated in Nevada in 2014, and has executive offices in Irvine, California.

26.     Scepter Holdings, Inc., describes itself as managing "the sales and brand development of high-performance consumer packaged goods."  Scepter (stock ticker symbol: BRZL) trades on OTC Link.  Scepter was incorporated in 2007 in Nevada, and has executive offices in Las Vegas, Nevada.

8

27.     CannaPharmaRx, Inc., describes itself as an "early-stage pharmaceutical company whose purpose is to advance cannabinoid research and discovery using proprietary formulation and drug delivery technology currently in development." CannaPharmaRx (stock ticker symbol: CPMD) trades on OTC Link. CannaPharmaRx was incorporated in Colorado in 1998 under another name and was eventually re-domiciled in Delaware in 2010, and has executive offices in Calgary, Alberta, Canada.

## **BACKGROUND**

28.     Before selling stock, persons who control the stock of public companies ("control persons") are required to: (a) register the stock sales with the Commission pursuant to Section 5 of the Securities Act [15 U.S.C. §77e]; (b) sell the stock pursuant to an applicable exemption from registration; or (c) sell the stock pursuant to conditions set forth in SEC Rule 144 [17 C.F.R. §240.144], including limitations on the amount of stock a control person can legally sell. Such registration requirements, sale restrictions, and disclosure obligations are safeguards designed to inform investors about the nature of the stock they are holding or considering buying, and about those from whom they would be buying that stock.

29.     An "affiliate" of a publicly traded company (also known as an "issuer") is a person or entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such issuer (i.e. a control person). "Control" means the power to direct management and policies of the company in question. Affiliates include officers, directors and controlling shareholders, as well as any person who is "under common control" with, or has common control of, an issuer. Absent registration of the stock, affiliates are only permitted to sell a small percentage of the outstanding shares of a stock according to SEC Rule 144 [17 C.F.R. §230.144]. A group of individuals and/or entities acting

9

in concert may collectively be an "affiliate" of an issuer.

30.     "Restricted stock" is stock of an issuer that is acquired from an issuer, or an affiliate of the issuer, in a private transaction that is not registered with the Commission.  Absent an exemption under the federal securities laws and rules, restricted stock cannot legally be offered or sold to the public unless a securities registration statement has been filed with the Commission (for an offer) or is in effect (for a sale).  Such registration statements are submitted and filed with the Commission on Form S-1 and are often referred to as "S-1 registration statements."  The S-1 registration statement contains important information about an issuer's business operations, financial condition, results of operation, risk factors, and management.

31.     "Unrestricted stock" is stock that may legally be offered and sold in the public marketplace by a non-affiliate, ordinarily having previously been subject to a registration statement filed with the Commission.  Registration statements are transaction specific, however, and apply to each separate offer and sale as detailed in the registration statement.  Registration does not attach to the security itself, and registration at one stage for one party does not necessarily suffice to register subsequent offers and sales by the same or different parties.  Thus, when a control person buys publicly-traded or otherwise unrestricted shares in the company that person controls, those shares automatically become subject to the legal restrictions on sales by an affiliate, which strictly limit the quantity of shares that may be sold in the public markets absent registration.  Without registration, affiliates are prohibited from selling large quantities of an issuer's shares, regardless of how the affiliates obtained those shares.

32.     The Over-the-Counter ("OTC") Markets is a stock quotation service that facilitates public trading of shares in public companies that are not otherwise listed on national securities exchanges (like NASDAQ or the New York Stock Exchange).  Public companies that

do not have an obligation to file reports with the Commission may, nonetheless, choose to file public reports (such as quarterly and annual statements and other periodic disclosures) on the OTC Markets website for investors to review and consider when making investment decisions.

33. A "beneficial owner" of a security is any person who, directly or indirectly, through any contract arrangement, understanding, relationship, or otherwise, has or shares investment power, which includes the power to dispose, or to direct the disposition of, such security.

34. A "penny stock" is defined in Section 3(a)(51) of the Exchange Act and in Rule 3a51-1 thereunder as an equity security that does not meet certain exemptions—essentially, most stocks that do not trade on a national securities exchange, that trade under $5 per share, and whose issuers do not meet certain thresholds of tangible assets or revenue. The securities of Odyssey, Scepter, and CannaPharmaRx were penny stocks during the Relevant Period.

35. A company is considered "public" when its securities trade on established markets and the company discloses certain business and financial information regularly to the investing public.

## THE FRAUDULENT SCHEMES

### Example 1: Odyssey

36. Odyssey was incorporated in Nevada in March 2014 and operated as a publicly traded company during the Relevant Period.

37. In the summer of 2019, Nicosia, Reininger, and Abujudeh agreed that Abujudeh, through his entity, Intermarket Associates LLC ("Intermarket"), would purchase 2.5 million shares of Odyssey stock for $100,000. Nicosia arranged for Abujudeh to purchase the shares from a California company purportedly run by one of Nicosia's business associates. The three

further agreed to fund various stock promotional campaigns to generate enough demand for Abujudeh to sell the 2.5 million shares, and to split the profits with half going to Abujudeh, and half going to Nicosia and Reininger collectively.

38. Nicosia, Reininger, and Abujudeh were affiliates of Odyssey. They were significant shareholders, collectively owning at least 17 percent of the outstanding shares at the start of their stock promotion, and, significantly, 98 percent of the shares that were deposited and available for public trading—i.e., 98 percent of the Odyssey float. Nicosia and Reininger were both involved in the management and operations of Odyssey and communicated directly with Odyssey's CEO (whom they recruited and interviewed for the position) about the company's operations and financial condition. Moreover, Odyssey relied on Nicosia to fund aspects of Odyssey's operations through a separate company Nicosia controlled. Reininger responded to investor inquiries by phone on behalf of Odyssey and held himself out as one of the company's founders. Nicosia, Reininger, and Abujudeh are collectively referred to herein as the "Odyssey Control Group."

39. Nicosia and Reininger initially tasked Abujudeh with hiring a phone room (as opposed to digital marketers) to promote Odyssey to investors. Abujudeh hired stock promoters described herein on behalf of the Odyssey Control Group and apprised Reininger and Nicosia of his efforts and the status of the promotion and its associated costs, along with profits from Odyssey share sales, via in-person meetings, telephone calls, encrypted messaging applications, and in limited circumstances email. Nicosia and Reininger caused Odyssey to issue periodic press releases to support their promotional campaign.

### The Odyssey Control Group Hired Di Carlo to Run a Deceptive Telephone Promotional Campaign

40.     The Odyssey Control Group sought to hire a stock promoter who could generate trading volume to support the rapid liquidation of 2.5 million shares at somewhere between $2.50 and $3 per share.  In the 30 months preceding the Odyssey Control Group's promotional campaigns, Odyssey shares were traded on just 25 days; on those 25 days, the trading volume averaged just 351 shares per day, with a weighted average closing price of less than one dollar per share.

41.     Touchard, a long-time associate of Abujudeh, identified a candidate for the task—Di Carlo—and introduced him to Abujudeh.  After meeting Touchard and Di Carlo in person, Abujudeh hired Di Carlo on behalf of the Odyssey Control Group.  The Odyssey Control Group agreed to pay Di Carlo approximately 30 percent of the proceeds from Odyssey share purchases that Di Carlo's phone room generated; Touchard received approximately 5 percent of the proceeds generated on these share purchases—a sum he split with a business partner also involved in the recruitment of Di Carlo.

42.     Di Carlo hired others to conduct the investor solicitations and oversaw their work. For example, when Abujudeh informed Di Carlo in a recorded call that Di Carlo's phone room was claiming commissions on stock sales that it did not generate, Di Carlo stated, "I was blindsided . . . I called everybody immediately.  I called them into my private office immediately. . . . And I've been ripping heads for the last three hours."

43.     Di Carlo, through Abujudeh, asked that Odyssey put out press releases to assist with the promotional campaign.  Abujudeh passed the request to Nicosia and Reininger who agreed.  Between January 15, 2020 and February 10, 2020, Odyssey issued four press releases.

44. Di Carlo understood who his solicitors were contacting and the methods they used to pitch Odyssey to prospective purchasers. When Touchard expressed concern that Di Carlo's use of an auto dialer could "get the company a skull and cross bones" on OTC Markets (i.e., a "caveat emptor" warning to prospective investors about a company's securities), Di Carlo explained, "It's manual dial. It's not an auto dialer. And we're working off the list one by one. 'Cuz auto dialer is like [expletive] robocall, and that [expletive] doesn't work and we don't do that."

45. Moreover, Di Carlo personally solicited some prospective purchasers himself. For example, when discussing a list of sales leads he received that he described as "complete, utter, and total [expletive]," Di Carlo explained, "I personally tested 100 of them. I was getting 18 year olds – teenage girls and fathers that were like, asking why I was calling their daughters."

46. Di Carlo and his stock promoters cold called potential investors and claimed they worked for an entity called "Investor's Quarterly" ("IQ"), and employed high-pressure, deceptive sales tactics, as described herein. Among the victims of these deceptive tactics were two individuals described below: Investor 1 and Investor 2.

47. Investor 1 was not a sophisticated investor and had never invested in penny stocks before investing in Odyssey. Investor 1 instead invested primarily in diversified mutual funds through his 401(k) retirement account, which was held at a large broker-dealer affiliated with one of the largest mutual fund companies in the world. In late January 2020, an individual purporting to be from IQ contacted Investor 1 multiple times by phone, touting Odyssey as a good investment. In one of the calls, the caller claiming to be an IQ representative was joined by another individual who falsely claimed that he worked for the broker-dealer where Investor 1 held his retirement investments. These two individuals convinced Investor 1 to roll over his

14

company-directed 401(k) account into a self-directed IRA brokerage account; sell his shares of a diversified retirement fund (worth about $130,000 at the time); and purchase Odyssey shares with the proceeds.  These individuals were part of Di Carlo's phone room that was promoting Odyssey on behalf of the Odyssey Control Group.

48.     The callers who identified themselves as IQ representatives continued to communicate with Investor 1 about Odyssey shares by phone, text messages, and email from late January through March 2020.  On January 30, 2020, one of the IQ representatives convinced Investor 1 to make his first four purchases of Odyssey stock, totaling 8,000 shares for $16,290. Investor 1 accounted for 97 percent of the trading in Odyssey's stock that day.  Di Carlo's phone room told Investor 1 over the phone that he would likely grow his retirement savings over the next four months to about a quarter million dollars.

49.     Over the next few weeks, Di Carlo's phone room instructed Investor 1 precisely when and at what price to bid on Odyssey shares using his online brokerage account, funded by liquidating his retirement savings.  The IQ representatives pressured Investor 1 to be available at all times to execute Odyssey trades and instructed Investor 1 to make bids at specific, escalating prices over time.

50.     From January 30 through February 20, 2020, Investor 1 bought approximately 61,800 Odyssey shares for approximately $126,000.  Nearly every Odyssey share that Investor 1 bought was sold into the market by the Odyssey Control Group, through Abujudeh and his company, Intermarket.

51.     By mid-February 2020, Investor 1 was becoming concerned about Odyssey's performance and was having difficulty reaching his contacts at IQ.  So Investor 1 contacted Odyssey directly by phone.  Reininger returned Investor 1's call on behalf of Odyssey on

February 18, 2020, leaving a voicemail in which he stated he was a founder of Odyssey and was returning Investor 1's call because the CEO was out of the country. Investor 1 eventually spoke by phone several times with Reininger, who denied knowing the IQ representatives and provided general information about Odyssey and the fluctuation of its stock price. Investor 1 lost approximately $39,533 from his Odyssey investment.

52.     Di Carlo's phone room, still identifying themselves as representatives of IQ, solicited another individual, Investor 2, to purchase Odyssey stock in January 2020. On or about January 27, 2020, one of Di Carlo's stock promoters placed an unsolicited phone call to Investor 2, during which he told Investor 2 that Odyssey was a great investment opportunity and that Investor 2 needed to invest quickly. Investor 2 was not familiar with Odyssey, nor had he ever invested in a penny stock. Also on January 27, 2020, IQ sent an email to Investor 2 that stated in part: "We believe the shares of ODYY [the stock ticker symbol for Odyssey] will double in value prior to the end of the calendar year."

53.     Beginning on January 28, 2020, Investor 2 followed IQ's recommendation and used a portion of his retirement savings to purchase Odyssey stock on four separate dates, buying a total of 6,000 shares. Investor 2 acquired those shares at prices between $2.02 and $2.19 per share.

54.     On January 30, 2020, IQ sent an email to Investor 2 that stated in part: "[L]et me know how many shares of ODYY you were able to pick-up today, and at what price. Its [sic] important that we track how many shares are purchased based on our recommendation because it impacts our selling strategy as well." IQ emailed again on February 12, 2020 about tracking Investor 2's purchases because "our sell recommendation is at least partially predicated on the number of shares we believe will be liquidated when we do provide said recommendation." IQ

16

did not inform Investor 2 that the Odyssey Control Group was paying commissions on all Odyssey purchases that IQ generated or that IQ was tracking investors' purchases to ensure those commissions were paid.

55.     When Investor 2 later tried to contact IQ with concerns about Odyssey's declining stock price, IQ did not respond.  Investor 2 sold all of his shares on May 26, 2020, sustaining a loss of approximately $7,217.

56.     Di Carlo's stock promotors never told Investor 1 or Investor 2 that they were hired by Odyssey insiders who controlled the company (the Odyssey Control Group); that the Odyssey Control Group controlled nearly all of the shares that could be publicly traded; that the Odyssey Control Group was selling their Odyssey shares into the promotion and splitting the profits; and that the Odyssey Control Group was paying them 30 percent commission on every share they sold through the promoters.

57.     The Odyssey Control Group, Di Carlo and Touchard, knew, or were reckless in not knowing, that the stock promoters that they directly and indirectly hired did not disclose this material information to prospective investors.  The Odyssey Control Group, Di Carlo, and Touchard further knew or were reckless in not knowing that the stock promoters that they directly and indirectly hired would employ additional deceptive means, including the high-pressure sales pitches and price manipulation tactics as described above to convince investors to purchase Odyssey shares and to manipulate the market for those shares.

58.     Abujudeh transferred by wire portions of the proceeds generated by Di Carlo's phone room to a bank account for which Di Carlo was the sole authorized signatory in the name of a company for which Di Carlo is the sole corporate officer identified in public records, on the dates and in the amounts shown in the chart below:

| Date | Amount |
|------|--------|
| 1/30/20 | $5,898 |
| 2/4/20 | $20,200 |
| 2/10/20 | $12,100 |

59.     On February 14, 2020, Di Carlo emailed Abujudeh and Touchard: "I have failed you on this deal… and apologetically admit that I did not live up to expectations." Di Carlo went on to suggest two other phone rooms "that can deliver the goods" for Odyssey.

60.     The conduct of Nicosia, Reininger, Di Carlo, and Touchard in carrying out this promotional campaign and offering and selling Odyssey shares, as described herein, was a scheme to defraud investors in the public markets. Defendants Nicosia and Reininger knew, as the persons controlling Odyssey, that they could not directly sell the shares they controlled, so they used Abujudeh as an intermediary to obtain and sell shares on their behalf, and promoters like Di Carlo and his employees (hired through Touchard) to manipulate the market for their shares. Their conduct was deceptive and caused significant harm to the investors who purchased shares at the urging of Di Carlo and his team.

## **The Odyssey Control Group and Touchard Schemed To Manipulate the Market for Odyssey Shares By Hiring the CW.**

61.     In February 2020, while Investor 1 was still buying Odyssey shares at the recommendation of Di Carlo's phone room, the Odyssey Control Group, along with Touchard, were planning to fire Di Carlo and hire a different phone room to promote Odyssey to investors. They were dissatisfied with the volume of Odyssey purchases Di Carlo was generating.

62.     On February 11, 2020, Abujudeh and Touchard, among others, met at a hotel in Newport Beach, California. Abujudeh, Touchard, and Touchard's business partner spoke together to Di Carlo and expressed frustration with the lack of trading volume. Touchard's business partner told Di Carlo in a surreptitiously recorded conversation: "[H]ey, here's where

we're at, Fabrizio.  We're at where the rubber meets the road. . . .  Charlie's getting pressure.  I got a lot of money in and out of these deals.  And … I need to recoup.  So . . . we're going to have to roll with you until Friday, big dog.  And then we got to unleash you.  . . .  We just don't have any more time."

63.      Di Carlo assured Abujudeh, Touchard, and Touchard's business partner that he would increase the Odyssey trading volume.  "All I need is a call with Charlie [Abujudeh] in about two hours . . . just to plan out the press release like we had spoken about. . . . Our guys have got it already structured.  And then watch what is going to happen in the next few days."  The volume Di Carlo generated "in the next few days" did not satisfy the Odyssey Control Group or Touchard.  They fired Di Carlo.

64.      With Reininger and Nicosia still calling on Abujudeh to use a phone room instead of digital promotions, Touchard and his business partner unwittingly introduced Abujudeh to a CW working for the FBI who claimed to run a phone room in Colombia capable of generating millions of dollars per month in penny stock sales.

65.      Acting at the direction of the FBI, the CW, who recorded phone conversations with the various parties, told Abujudeh that he ran a stock promotion phone room in Medellín, Colombia that could generate up to $3.5 million per month in stock purchases, depending on the penny stock at issue.  Abujudeh and Touchard offered the Odyssey promotional campaign to the CW on February 26, 2020.  With Abujudeh on the phone, Touchard told the CW:  "I'm here with Charlie [Abujudeh].  And basically, long story short, ODYY [the ticker symbol for Odyssey] is available if you can start quick.  Just fired the other phone line that was on it.  And Charlie's built landing pages.  Everything's ready to go."  Di Carlo's IQ was, in Touchard's words, "the

other phone line" that was promoting Odyssey. "Landing pages" refers to promotional websites to which stock promoters can refer potential stock purchasers, either by phone or email.

66.     The Odyssey Control Group and Touchard all agreed to pay the CW a 35 percent commission on Odyssey stock purchases from Abujudeh that the CW's phone room generated. Abujudeh expected the CW to generate purchases of 100,000 shares in the first week the phone room operated, and hundreds of thousands of shares per week thereafter. Abujudeh further required the CW to generate purchases of at least 40,000 Odyssey shares per day (200,000 shares per week). In contrast, from the first public trade of Odyssey shares in 2017 until the time Odyssey hired IQ (about 30 months), the total volume of odyssey trading was 8,765 shares—far less than Abujudeh, Touchard, and the Odyssey Control Group hired the CW to generate in a single day.

67.     Over the course of several conversations and encrypted text messages from January 29 through March 11, 2020, Abujudeh and Touchard, on behalf of the Odyssey Control Group, continued to discuss with the CW and others how the fraud scheme would operate.

**Control of the Odyssey Float**

68.     First, Nicosia, Reininger, Touchard, and Abujudeh understood that it was essential for the Odyssey Control Group to control the Odyssey float at the outset of the promotion. Otherwise, third parties could sell into their promotion, depressing share prices, undercutting their profits, and otherwise benefiting from the inflated demand that their promotion would generate. Indeed, control of the float was the linchpin of their scheme. And Nicosia and Reininger specifically assured Abujudeh that no other Odyssey shareholders would deposit shares and sell into the promotion for these very reasons. And Abujudeh and Touchard, in turn, assured the CW that the group controlled the Odyssey float multiple times, including on

February 11, 2020.  In a recorded call that day, the CW noted that according to information publicly available on OTC Markets, the Odyssey float was approximately 15 million shares.  But Abujudeh corrected him:  "No there's not. . . . [T]here's nothing outside our control.  There are probably 100,000 shares max."  The Odyssey Control Group and Touchard understood that their nearly 2.5 million Odyssey shares constituted almost all of the shares that were deposited (or would likely be deposited during the promotional campaign) and available for public trading.

**The Odyssey Control Group's Scheme To Manipulate Trading Volume and Share Price Through  Deceptive Promotion and Control of the Float**

69.     The Odyssey Control Group understood that by hiring the CW, they would be able not only to generate demand for Odyssey shares through deceptive sales pitches, but also to convince Odyssey investors to hold their shares, and thereby support Odyssey's share price, while they dumped their shares into the market.

70.     The Odyssey Control Group recognized that as they sold shares into the promotion, the individuals who bought their shares could re-sell them, potentially depressing the stock price and/or earning profits that they would have otherwise captured.  Abujudeh discussed this concern with the CW.  The CW reassured Abujudeh that although some investors would inevitably sell early, he intended to "pitch" Odyssey as a longer-term investment so that his investors would hold onto the stock.

71.     The Odyssey Control Group and Touchard understood that the CW would not reveal that the Odyssey Control Group was funding the promotion and simultaneously dumping its stock, which constituted nearly the entire supply of Odyssey shares.  In fact, Abujudeh, on behalf of the Odyssey Control Group, agreed that commission payments for the phone room sales would be routed through a third party that did not own Odyssey shares to conceal the Odyssey Control Group's involvement.  Abujudeh, on behalf of the Odyssey Control Group,

further agreed that they would sign what the CW described as "something like a retainer agreement for marketing services or something stupid like that."

72.     Over the course of several recorded conversations with the CW, Abujudeh and Touchard made clear that they were working on behalf of a group that included Odyssey insiders who controlled the company and were coordinating the Odyssey stock promotion with those individuals.

73.     On February 11, 2020, for example, Abujudeh and Touchard confirmed their advance notice of Odyssey press releases:

| CW | But let me ask you guys a question.  How, how tight are you guys with ODYY?  If we need some news or need a PR [press release] or something like that, can we get it out? |
| Abujudeh | [inaudible] We've got news tomorrow. [inaudible] . . . [To Touchard, referring to prior promoter:] . . . he's required three news releases so far.  The company can't just keep making up shit. |
| Touchard | Yeah, no we're tight with the company.  Good relationship with the company. |
| CW | Okay, cool.  Just, yeah, you just want to make sure the CEO is not, like, against us, you know what I'm saying? If we need a news article or we need, you know, something to, to help us if we get stuck, it's sometimes nice to – |
| Abujudeh | There, there was recent news on it and there's news going to be on it tomorrow. |

When Touchard stated that he and Abujudeh were "tight with the company," he was referring to his and Abujudeh's relationship with Nicosia and Reininger.

74.     On March 9, 2020, Touchard called the CW to provide "just a little more background" about Abujudeh's relationship with Odyssey and the Odyssey Control Group. Touchard stated that the "relationship with corporate . . . is a little bit strained because of false promises of different IR [investor relations] groups" that were previously involved in promoting Odyssey's stock.  Touchard further conveyed that Odyssey's management (which he described

as "the corporate end" and included Nicosia and Reininger) was frustrated by the lack of trading

volume generated from their promotion of Odyssey involving prior news releases, and noted that

the prior promoters had misled Abujudeh and Touchard about their ability to generate trading

volume from company news.

75.     In a March 11, 2020, recorded call with Touchard, the CW said that Abujudeh

had unrealistic expectations of sustaining a phone campaign that would keep a share price well

above $2 per share while dumping millions of shares.  Touchard explained the Odyssey Control

Group's desire to maintain a higher share price:

> ODYY [the ticker symbol for Odyssey] has been going on for—
> [expletive], we've been involved for two months and he [Abujudeh]
> probably – he's had it for four months probably. . . . and the problem is
> he's got a company that's expecting a million bucks four months ago.
> And they're calling him every day:  "Where's my million bucks?"  He's
> got pressure, pressure, pressure and the problem is he puts that pressure on
> me and he puts that pressure on you.  So I try to find solutions for him.
> Right?  So, if you're not going – $100,000 a day, he [Abujudeh] calls me:
> "Why is [the CW] not doing $100,000 a day?  You said he was a great guy
> and could do miracles and all this stuff."  I'm like:  "What the
> [expletive]?"  You know what I mean?

**Odyssey Control Group's Digital Promotion of Odyssey**

76.     The Odyssey Control Group and Touchard were, of course, unable to hire the CW

to run a promotional call center because the CW was working at the direction of the FBI.  So the

Odyssey Control Group instead funded and controlled a digital campaign that promoted Odyssey

stock to potential investors through ads displayed on websites ("display ads") and dozens of

newsletters directing investors to at least one website touting Odyssey.  The digital promotions

ran from March through early July 2020.

77.     The Odyssey Control Group used Abujudeh's company, Intermarket, to pay for

its digital promotional campaign.  For example, between June 5 and July 6, 2020, Intermarket

made four wire transfer payments totaling $430,000 to a Florida company for "Marketing ODYY." This company (the "Florida Promoter") acted as both a stock promoter and a broker for stock promoters. Thus, the Florida Promoter not only distributed Odyssey promotion materials to its own lists of potential investors, but also operated as a pass-through entity, and accordingly used a portion of the $430,000 to pay a New York company for "Marketing Awareness Services for Odyssey Group Intl Inc," according to billing records. Because of this layering, in promotional materials they disseminated, the New York company (and others) identified the Florida Promoter, rather than the members of the Odyssey Control Group or entities that group owned, as the party that funded the promotion.

78.     The Odyssey Control Group generally approved the content of promotional materials. For example, on February 14, 2020, Abujudeh received an email stating, "Hi Charlie, I've attached your landing page [for Odyssey]. Please have all of the content checked for accuracy and let me know if you would like anything changed. Once I have your approval I'll get started on emails." Abujudeh, who knew little about the company, sent the promotion content (without any description of who was paying for the promotion) to Nicosia for review and approval. Nicosia, in turn, sought and obtained the Odyssey CEO's approval of the landing page (i.e., website) content.

79.     The landing page described above was hosted at the domain dearwallstreet.com, and various promotional materials used during the campaign included links directing investors to this website. The landing page claimed that Odyssey stock was a "**Way to Capitalize On The Trillion Dollar Healthcare Sector.**" (Emphasis original). The landing page further described Odyssey as being "in a prime position to potentially dominate the market" for medical devices in the United States, with "heart monitoring and screening" technology that is "well poised to take

the market by storm." The page also described Odyssey's partnership with a biopharmaceutical company that "could quite possibly facilitate the release of the FIRST EVER concussion treatment drug. Which would be an IMMENSE feat in an untouched market." Odyssey's personal anti-choking device was described as being potentially "**AS BIG AS THE BABY MONITOR**." (Emphasis original). Around the same time that the Odyssey Control Group was launching this landing page touting Odyssey's prospects, the Odyssey CEO emailed Nicosia: "Matt, ODYSSEY is out of money," and sought to have one of Nicosia's companies pay an auditor who would not perform any further work until an old bill was paid.

80. Once the landing page was launched, it also contained a disclaimer with the following statement regarding compensation for the promotion:

> Pursuant to an agreement between Quantum Capital and
> DearWallstreet.com, we were hired to publicly disseminate
> information about (( ODYY )) including on the Website and other
> media including Facebook and Twitter. We were paid up to $300k
> in cash from Quantum Capital. We own zero shares of (( ODYY ))
> which we purchased in the open market. We may buy or sell
> additional shares of (( ODYY )) in the open market at any time,
> including before, during or after the Website and Information,
> provide public dissemination of favorable Information.

The Odyssey Control Group knew or was reckless in not knowing that this information it was disseminating through its hired promotors was false and misleading, and/or omitted material information it was obligated to disclose. First, this landing page, like many of the promotional materials they funded, stated that "Quantum Capital" funded the promotion and/or hired the promoters. This was false. The Odyssey Control Group paid for the promotion through Intermarket, and controlled the content of the promotion. "Quantum Capital" did not pay for the promotion.

81. Moreover, the disclaimer omitted the material information that the Odyssey Control Group that funded the promotion were Odyssey insiders involved in management of the

25

company, controlled the vast majority of the Odyssey shares available for trading, and that the Odyssey Control Group, through Abujudeh and Intermarket, intended to sell—and was in fact selling—those shares during the promotion they funded. The Odyssey Control Group knowingly or recklessly concealed this information from the investing public.

82.     Between March 26, 2020 and July 6, 2020, the Odyssey Control Group funded more than forty different emails touting Odyssey that were sent to thousands of potential investors. Despite having sold Odyssey stock on a majority of trading days in February 2020, while Investor 1 was buying Odyssey stock, Abujudeh, through Intermarket, did not sell any Odyssey shares from early March until March 25, 2020, the day before the email promotion began. On that day, Intermarket both bought and sold 500 shares of Odyssey stock in two different transactions. Intermarket bought 500 shares at $1.30 each, and sold 500 at $1.25 each, losing a total of $25 on those two trades that day. Notably, there was no other trading in Odyssey stock that day; Abujudeh's trades on behalf of the Odyssey Control Group created an illusion of legitimate market activity in Odyssey stock ahead of promotional emails being sent to unwitting retail investors. On March 27, 2020, the day after the first promotional email was distributed, Abujudeh sold 20,109 shares.

83.     Emails funded by the Odyssey Control Group continued to promote Odyssey in various ways for several months. For example, on April 23, 2020, "Stock of the Week" sent out an email, subject: "[Subscriber Name], this could be the Next Med-Tech Stock to Deliver Massive Returns." The email text stated: "**There's a Med-Tech Company on Wall Street Going Quietly Undetected** that is involved with several revolutionary medical devices that could soon hit the market!" (Emphasis original, hyperlink to landing page). The email claimed that the company's devices were "cutting edge and game changing" and that "if Wall Street

learns about the devices this company has, it could lead to one of the biggest breakouts in the healthcare arena this year!"  The email specifically touted the stock's "**super small trading float**." (Emphasis original).  The email did not name Odyssey, but contained text hyperlinks to the above-described landing page:  "<u>**Hurry And Find Out More HERE Before Wall Street Discovers This Undervalued Bargain!**</u>"  (Emphasis original, hyperlink to landing page).  The email stated that it was paid for by a third party, but did not identify that party, let alone the fact that the third party, the Odyssey Control Group, included company insiders, dominated the market for Odyssey shares and intended to sell all of its holdings into the promotion.  Another nearly identical email dated April 21, 2020, from "Market Profit Center" entirely failed to disclose it was a paid promotion.

84.    Another promotional email dated May 11, 2020, from "Pro Trader Elite" carried a subject line: "Medtech is about to skyrocket."  The body of the email contained the header "**This Could Be The Next BioTech Stock To Rally**" (emphasis original) and included a link to the Odyssey landing page.  The fine print disclaimer noted that the Florida Promoter had paid for the promotion and that "a third party of [Pro Trader Elite] LLC may have shares and may liquidate." At this point, the Odyssey Control Group had already sold, through Abujudeh, over 330,000 shares into the promotion it funded, and purchased nearly 100.000 additional shares on thirteen different days in order to artificially support the stock price during the promotion.  In the next month alone, Abujudeh sold on behalf of the Odyssey Control Group nearly 600,000 more shares into the promotion.

85.    As described above, among the promotional emails that carried fine-print disclaimers, the disclaimer content varied.  Some stated that the emails were part of a paid campaign without accurately identifying the payer, or the payer's role as a seller; others stated

that investors should assume the payer held Odyssey shares and intended to sell them. But these email disclaimers nonetheless provided inaccurate, incomplete, and misleading information.

86. On March 27, 2020, the day after the first Odyssey promotional email went out, OTC Markets, the service that publicized trading data and quotations for Odyssey, emailed the Odyssey CEO to indicate that a "Stock Promotion flag" was being placed on the company's profile page based on a current promotional campaign, and attached two sample promotional emails. Minutes later the Odyssey CEO forwarded that email, and attachments, to Nicosia. Both emails identified Quantum Capital as the party paying for the promotion and failed to identify the relationship between the paying party and the Odyssey Control Group. Nicosia told Abujudeh to stop identifying Quantum as the paying party and to name a different entity instead.

87. When the Odyssey CEO inquired about the promotion, both Nicosia and Reininger denied knowing anything about it.

88. Nicosia and Reininger knew or were reckless in not knowing that they were company affiliates who were unable to sell Odyssey shares without registering those sales or complying with legally mandated sales limitations. They therefore engaged in a scheme to defraud the investing public by secretly selling shares through an intermediary, Abujudeh, knowing that they were evading their disclosure obligations and/or sales limitations as affiliates of Odyssey. To accomplish this scheme, they sponsored deceptive promotional campaigns that hid from investors that they controlled Odyssey; that they controlled the vast majority of the Odyssey float; that they funded and controlled the content of the promotions (in some instances paying extraordinarily high commissions to incentivize sales); and that they were selling shares through an intermediary into that promotion and splitting the profits among themselves. Nicosia and Reininger knew or were reckless in not knowing that the promotional campaigns they

28

controlled and funded would omit these material facts and were otherwise deceptive, as described above.

89.     The email promotional campaign was successful, generating enough demand for Odyssey stock to enable the Odyssey Control Group to finish selling all 2.5 million of the shares held by Intermarket, as shown in the chart below.  In all, the Odyssey Control Group generated approximately $2.6 million in proceeds from selling Odyssey stock into the various promotions they funded, and accounted for much of the trading volume during that time, as shown in the graph below.



90.     On July 8, 2020, as he prepared to liquidate his last Odyssey shares on behalf of the Odyssey Control Group, Abujudeh wrote a $200,000 check from his Intermarket account to Reininger's company, Regal Growth Funding, Inc. for "consulting services."  A $100,000 wire transfer followed on July 21, 2020, and a $50,000 wire transfer was sent September 4, 2020, for "marketing."  Reininger, in turn, sent half of each of those money transfers to PolarWeb Media

Partners One, Inc., controlled by Nicosia.  The payments constituted proceeds from shares that Abujudeh sold on behalf of the Odyssey Control Group.

91.     Despite frequent phone calls between Reininger and Abujudeh during the course of the Odyssey promotional campaign, Reininger denied knowing Abujudeh during a recorded interview with Commission staff.  Reininger continued to communicate with Abujudeh after he denied knowing him.  The Commission staff then issued a subpoena seeking documents from Reininger's company, Regal Growth Funding.  Nicosia called Abujudeh to inform him that "Rocky" (i.e., Reininger) had received a subpoena, and the two discussed ways to conceal the true purpose of the payments from Intermarket to Regal Growth Funding.  To accomplish this goal, Nicosia and Reininger fabricated three agreements purporting to document Intermarket's purchase of blockchain tokens relating to Scepter from Regal Growth Funding.  But Intermarket never made these purchases—the fabricated documents were intended to cover up Abujudeh's distribution of stock sale proceeds to Nicosia and Reininger.  Nicosia, who drafted the agreements with Reininger, asked Abujudeh to sign the agreements.  Abujudeh did not sign them.  But Reininger did sign them, and Regal Growth Funding produced the fabricated documents to Commission staff.

### The Odyssey Control Group's Unregistered Offers and Sales of Odyssey Stock

92.     Reininger and Nicosia were Odyssey affiliates by virtue of their substantial Odyssey share holdings; their roles in the management, funding, and operations of the company; and their control of the Odyssey stock float.  Abujudeh offered and sold Odyssey shares on behalf of himself, Nicosia, and Reininger.

93.     At the time that Abujudeh and the Odyssey Control Group offered and sold Odyssey stock, there was no registration statement for those sales on file with the Commission or

in effect as to those transactions, as required by Section 5 of the Securities Act. No exception from the registration requirement applied.

**Additional Publicly Traded Companies Dumped by Nicosia and Reininger**

94. In addition to the stock of Odyssey, Reininger and/or Nicosia sold the stock of other publicly traded companies, including Scepter and CannaPharmaRx, through Abujudeh during deceptive promotional campaigns that they funded—promotions that were similar to their digital promotion of Odyssey described above.

95. They did so while concealing that they were company affiliates who, among other things, controlled the vast majority of the float in these securities and that they were selling their holdings into their promotions. They did so without registering the sales with the Commission pursuant to Section 5 of the Securities Act. No exception from the registration requirement applied.

96. Abujudeh hired stock promoters described herein on behalf of Reininger and/or Nicosia and regularly apprised them of his efforts and the status of the promotions and their associated costs, along with share sales and associated profits, via in-person meetings, telephone calls, encrypted messaging applications, and in limited circumstances email.

**Example 2: Scepter**

97. In or around the spring of 2019, Nicosia and Reininger approached Abujudeh regarding the potential promotion and sale of Scepter shares.

98. The three agreed that Abujudeh would acquire shares on behalf of the group, promote the stock on behalf of the group, sell shares into the demand generated by the promotion, and then split the profits, with half going to Reininger and Nicosia, and half going to Abujudeh.

99.     Abujudeh acquired Scepter shares in a transaction arranged by Nicosia. Specifically, Nicosia arranged for Abujudeh to purchase the right to the issuance of unrestricted Scepter shares via a court-approved settlement agreement pursuant to Section 3(a)(10) of the Securities Act between Scepter and a Wyoming company.  At Nicosia's direction, Abujudeh had Scepter issue him purportedly unrestricted stock in several tranches of shares, beginning with 100,000,000 shares in or about August 2019.

100.     After Abujudeh acquired and deposited his first tranche of Scepter shares, Nicosia, Reininger, and Abujudeh, through entities they controlled, owned at least 61 percent of the outstanding Scepter shares and approximately 91 percent of the Scepter float. In addition to holding a significant stake in Scepter, Nicosia also advised the company's Chairman of the Board of Directors (an individual whom Nicosia recruited and who acted as the company's principal executive officer) regarding business development and other corporate matters.  For these and other reasons, Nicosia, Reininger, and Abujudeh (by working with them and on their behalf) were affiliates of Scepter.  Nicosia and Reininger knew or were reckless in not knowing their status as Scepter affiliates and the attendant limitations on the sale of stock they controlled. Because Abujudeh was acquiring and selling shares on behalf of Scepter affiliates, and was himself a Scepter affiliate, the shares he deposited and ultimately sold were restricted and subject to registration requirements or limitations on the timing and quantity of sales.

101.     Nicosia and Reininger schemed with Abujudeh to defraud the market as well as market intermediaries such as broker-dealers by secretly arranging for Abujudeh to acquire and sell Scepter shares on their behalf without registering the sales or complying with legally mandated sale limitations on Scepter affiliates.

102.     In order to deposit the Scepter shares with a broker and eventually sell them, Abujudeh stated in the broker's due diligence questionnaire that: (1) he would not make a payment to any company affiliate in connection with the sale of Scepter shares; (2) he had no relationship with Scepter affiliates; and (3) he had no plan to promote or engage a third party to promote Scepter shares.  These statements were false and misleading, and were made in furtherance of the fraudulent scheme.

103.     In order to accomplish their scheme, Nicosia, Reininger, and Abujudeh funded a promotional campaign to generate demand for Scepter shares.[1]  The promotional campaign ran from approximately February to August 2020, and included emails and landing pages, like the ones Nicosia, Reininger, and Abujudeh funded for Odyssey.  For example, on March 3, 2020, an email sent to potential investors stated at the top in blue bold letters, "**BRZL [the stock ticker symbol for Scepter] has shifted in a PARABOLIC state and a MASSIVE Short Squeeze Opportunity could send share prices past $0.14 at any moment! Make sure you act fast!**" (Emphasis original).  The disclaimer at the bottom of this email stated, in relevant part:  "We do not own any shares in BRZL. We have been compensated $35k cash via bank wire by a third party, Quantum Capital, LLC, to conduct investor relations advertising and marketing for BRZL . . . .  The third party, profiled company, or their affiliates likely wish to liquidate shares of the profiled company at or near the time you receive this communication, which has the potential to hurt share prices."  This disclaimer was written in white text on a white background and is only visible when manipulated, for example, by selecting the text, pasting it into a new document, and

---

[1] At the outset of the campaign, Nicosia, Reininger and Abujudeh, through entities they controlled, still owned at least 61 percent of the outstanding Scepter shares.  Their share of the float had dipped only slightly, to approximately 87 percent, and Nicosia was still involved in Scepter's business development and other corporate matters.

changing its color. Not only was the disclaimer inaccurate—Abujudeh had in fact been selling shares into the promotion on behalf of himself, Reininger, and Nicosia and continued to do so— it was essentially invisible to potential investors.

104.    An April 30, 2020 mass email that Nicosia, Reininger, and Abujudeh funded stated in part, "As I said, if you missed out on **BRZL** so far this week… **DO NOT MISS IT TODAY!**"  The disclaimer stated:  "TheWolfofPennyStocks.com has been compensated seventy-four thousand dollars cash via bank wire by a third party, [the Florida Promoter] for a one week Scepter Holdings Inc. marketing Services contract. **TheWolfofPennyStocks.com does not own any shares of BRZL.** TheWolfofPennyStocks.com does not investigate the background of any third party.  The third party may have shares and may liquidate it, which may negatively affect the stock price."

105.    Until at least June 16, 2021, Scepter had a landing page hosted at http://dearwallstreet.com/ar/brzl/.  That landing page, along with the landing pages for Odyssey and CannaPharmaRx were taken down at some point on or after June 16, 2021.  The Scepter landing page bore the date February 26, 2020, and indicated it was sponsored by Quantum Capital.  The landing page opened by stating, "**With revenues and sales skyrocketing, Scepter [] may soon become one of the most beloved stocks on Wall Street!**"  (Emphasis original.) The page touted a "recent endeavor with hand sanitizer and nose air filters" and highlights increasing coronavirus cases concluding, "**Scepter Holdings, Inc., (OTCPK: BRZL) may be poised to see monstrous upside as the company is involved with products that could become staples for many households across the nation!**"  (Emphasis added.)

106.    The Scepter landing page included a disclaimer stating "We were paid up to $600,000 in cash from Quantum Capital. We own zero shares of ((BRZL)) which we purchased

in the open market." The disclaimer, like others, omitted material information that Nicosia, Reininger, and Abujudeh were Scepter affiliates who owned the majority of the outstanding company shares, the vast majority of the Scepter shares available for trading, and that they intended to sell—and was in fact selling—those shares during the promotion they funded. The above-described April 30, 2020 email directing potential investors to that landing page suffers the same material misstatements and omissions.

107.     Nicosia and Reininger knew or were reckless in not knowing that the promotional campaign they were funding with Abujudeh included emails and websites such as the ones quoted above that omitted material facts that were required to be disclosed or were otherwise deceptive. In those promotional materials, Nicosia, Reininger, and Abujudeh concealed that they were company affiliates; that they paid for and controlled the content of the promotion; that they controlled the vast majority of the Scepter float; and that they were selling their Scepter stock during the promotion.

108.     Abujudeh sold approximately 150,886,948 Scepter shares on behalf of the group for approximately \$3.2 million in gross proceeds. He shared the profits from these sales with Nicosia and Reininger.

### Example 3:  CannaPharmaRx

109.     During the Relevant Period, Nicosia was a member of CannaPharmaRx's Board of Directors and, according to CannaPharmaRx, was the company's largest shareholder, controlling approximately 16.2 percent of the outstanding shares.[2]  Nicosia had also recruited the

---

[2] As described in the company's 2020 Form 10-K, Nicosia owned Series A Preferred shares that were each convertible to 1,250 shares of common stock. The company, for purposes of disclosing beneficial ownership of directors, executive officers and other who owned more than 5 percent of the outstanding common stock, treated these Preferred shares as having been converted to common stock, and disclosed Nicosia as the beneficial owner of 16.2 percent of the outstanding shares.

company's CEO and worked closely with the CEO and others to manage the business. For these and other reasons, Nicosia was an affiliate of CannaPharmaRx. Nicosia knew or was reckless in not knowing his status as a CannaPharmaRx affiliate and the attendant limitations on the sale of stock he controlled.

110.    Nicosia schemed with Abujudeh to defraud the market by secretly arranging for Abujudeh to acquire and sell CannaPharmaRx shares on his behalf without registering the sales or complying with legally mandated sale limitations on CannaPharmaRx affiliates. To effectuate the scheme, he and Abujudeh conducted a deceptive digital promotional campaign to tout the stock without informing investors that Nicosia controlled the company, that he was paying to promote the stock, and that, through Abujudeh, he controlled the float and was dumping shares into his promotion.

111.    In or around the spring of 2020, Nicosia approached Abujudeh regarding the potential promotion and sale of CannaPharmaRx shares. Reininger was not included in the deal. Nicosia arranged for Abujudeh to purchase 3,125,000 CannaPharmaRx shares from a third party affiliated with CannaPharmRx's CEO for $50,000. Nicosia and Abujudeh agreed that Abujudeh would promote the stock to the investing public while selling shares on behalf of himself and Nicosia. The two agreed to split profits from the sales. Nicosia knew or was reckless in not knowing that because he was an affiliate of CannaPharmaRx and Abujudeh had acquired the shares on behalf of both himself and Nicosia, those shares were restricted shares, subject to registration requirements or limitations on the timing and volume of sales. To effectuate his scheme to dump restricted shares into the market, Nicosia tasked Abujudeh with conducting digital promotions of CannaPharmaRx shares.

112. The promotions Abujudeh and Nicosia funded for these stocks included emails and landing pages, like the ones they funded for Odyssey. Similarly, Abujudeh submitted the content of these promotional materials to Nicosia for approval. At Nicosia's request, CannaPharmaRx's CEO approved the content (without any description of who was paying for the promotion) of at least some of the promotional materials.

113. The stock promotion campaign that Nicosia and Abujudeh funded ran in August and September 2020. Around that time, Nicosia and Abujudeh together owned approximately 80 percent of the CannaPharmaRx float.

114. Nicosia and Abujudeh promoted CannaPharmaRx in emails like one that was sent to potential investors on September 1, 2020, which stated in part, "Usually you can find a bounce play with 20-30% upside. But . . . nearly **150% IMMEDIATE UPSIDE!?!** This is no joke! And **CPMD** [the stock ticker symbol for CannaPharmRx] *already* Bounced 41% on Monday! . . . So are you ready to 'Catch the Bounce' again today to potentially even greater highs?" (Emphasis original.) The disclaimer on this email noted that the publisher had been compensated $70,000 by a Kansas company, and noted only that a "third party may have shares and may liquidate it, which may negatively affect the stock price." From August 28 to September 28, 2020, Intermarket sent the Kansas company three wire transfers totaling approximately $319,000 for "CPMD."

115. CannaPharmaRx had a landing page hosted at http://dearwallstreet.com/ar/cpmd/. The landing page bore the date July 2, 2020 and indicated it was sponsored by Quantum Capital. The landing page referred to loosening of government regulations and strong demand for cannabis, particularly in light of the coronavirus pandemic. The page concluded

"CannaPharmaRx, Inc. (OTC: CPMD) could become one of Canada's biggest and most important companies in the cannabis market and is worth watching at current levels!"

116.    The CannaPharmaRx landing page included a disclaimer stating:  "We were paid up to \$300k in cash from Quantum Capital. We own zero shares of ((CPMD)) which we purchased in the open market."  The disclaimer, like the above described September 1, 2020 email and others, omitted material information that Nicosia and Abujudeh were company affiliates who controlled the vast majority of the CannaPharmaRx shares available for trading, and that Nicosia—a CannaPharmaRx board member and the company's largest single shareholder—intended to and was in fact selling shares through Abujudeh—during the promotion they funded.  Abujudeh sold approximately 3,124,700 shares on behalf of himself and Nicosia for \$3.3 million in gross proceeds.

117.    At the direction of Nicosia, Abujudeh transferred by wire portions of the proceeds to an account in the name of a company for which the CannaPharmaRx CEO was the sole director, on the dates and in the amounts shown in the chart below:

| Date | Amount |
|---|---|
| 8/26/20 | \$55,800 |
| 9/14/20 | \$86,250 |
| 10/8/20 | \$50,000 |

The CannaPharmaRx CEO provided the wiring instructions directly to Nicosia, who forwarded them to Abujudeh to wire transfer proceeds from the CannapharmaRx stock sales.  Abujudeh also distributed proceeds to one or more other accounts at Nicosia's direction.

118.    Nicosia knew or was reckless in not knowing that the promotional campaign he was funding with Abujudeh included emails and websites such as the ones quoted above that omitted material facts that were required to be disclosed or were otherwise deceptive.  Nicosia and Abujudeh concealed that they were company affiliates; that they paid for and controlled the

38

content of the promotion; that they controlled the vast majority of the CannaPharmaRx float; and that they were selling their CannaPharmaRx stock during the promotion.

### FIRST CLAIM FOR RELIEF
### FRAUD IN THE OFFER OR SALE OF SECURITIES
#### (Violations of Sections 17(a)(1) and (3) of the Securities Act)

119. Paragraphs 1 through 118 above are re-alleged and incorporated by reference as if fully set forth herein.

120. During the Relevant Period, the stock of Odyssey, Scepter, and CannaPharmaRx was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

121. By reason of the conduct described above, defendants Nicosia, Reininger, Di Carlo, and Touchard, in connection with the offer or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, acting intentionally, knowingly, recklessly or negligently (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

122. By reason of the conduct described above, defendants Nicosia, Reininger, Di Carlo, and Touchard violated Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §77q(a)(1) and (3)] and will continue to violate those sections unless enjoined.

### SECOND CLAIM FOR RELIEF
### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
#### (Violations of Section 10(b) of the Exchange Act and
#### Rules 10b-5(a) and (c) thereunder)

123. Paragraphs 1 through 118 above are re-alleged and incorporated by reference as if fully set forth herein.

124.     During the Relevant Period, the stock of Odyssey, Scepter, and CannaPharmaRx was each a security under Section 3(a)(10) of the Exchange Act [15 U.S.C. §78c(a)(10)].

125.     By reason of the conduct described above, defendants Nicosia, Reininger, Di Carlo, and Touchard, directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly or recklessly, (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

126.     By reason of the conduct described above, defendants Nicosia, Reininger, Di Carlo, and Touchard violated Exchange Act Section 10(b) [15 U.S.C. §78j(b)] and Rules 10b-5(a) and (c) [17 C.F.R. §240.10b-5(a) and (c)] thereunder.

### THIRD CLAIM FOR RELIEF
### UNREGISTERED OFFERINGS OF SECURITIES
#### (Violations of Sections 5(a) and 5(c) of the Securities Act)

127.     Paragraphs 1 through 118 above are re-alleged and incorporated by reference as if fully set forth herein.

128.     During the Relevant Period, the stock of Odyssey, Scepter, and CannaPharmaRx was each a security under Section 2(a)(1) of the Securities Act [15 U.S.C. §77b(a)(1)].

129.     By reason of the conduct described above, defendants Nicosia and Reininger, directly or indirectly:  (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been in effect and for which no exemption from registration has been available; and/or (b) made use of the means

or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of a prospectus or otherwise, securities as to which no registration statement has been filed and for which no exemption from registration has been available.

130.     As a result, defendants Nicosia and Reininger violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§77e(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

A.     Permanently restrain defendants Nicosia, Reininger, Di Carlo, and Touchard, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q], and Sections 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

B.     Permanently restrain defendants Nicosia and Reininger, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating Section 5 of the Securities Act [15 U.S.C. §§ 77e].

C.     Order the Defendants to disgorge, with prejudgment interest, all ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint;

C.     Order the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

D.    Enter an order barring the Defendants from participating in any offering of a penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

E.    Enter an order barring defendants Nicosia and Reininger from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.SC. § 78o(d)];

F.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

G.    Grant such other and further relief as this Court may deem just and proper.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

DATED this 27th day of September, 2022.

Respectfully submitted,

*s/ Nita K. Klunder*
Nita K. Klunder
David D'Addio*

Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
617-573-8822 (Nita Klunder)

*Not admitted in the U.S. District Court for the Eastern District of New York