UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

        -against-                            **REPORT AND RECOMMENDATION**

MATTHEW NICOSIA,                        22 CV 5761 (PKC) (CLP)
WILLIAM ("ROCKY") REININGER,
FABRIZIO DI CARLO, and
RONALD TOUCHARD,

                Defendants.
-----------------------------------------------------------X

**POLLAK**, United States Magistrate Judge:

       On September 27, 2022, the Securities and Exchange Commission ("SEC") commenced this action against Matthew Nicosia, William ("Rocky") Reininger, Fabrizio Di Carlo, and Ronald Touchard, alleging that the defendants engaged in "fraudulent schemes to sell publicly traded stock to retail investors." (Compl.[1] ¶ 1). The Complaint alleges that from around August 2019 through September 2020, the defendants fraudulently sold penny stocks of one or more of the following companies: Odyssey Group International, Inc. ("Odyssey"), Scepter Holdings, Inc. ("Scepter"), and CannaPharmaRx, Inc. ("CannaPharmaRx"). (Id.) The SEC and defendants Nicosia, Reininger, and Touchard reached a settlement in March 2023, which was Ordered by the District Court. (ECF Nos. 24, 25). The SEC then proceeded to file the instant motion for default judgment against the remaining defendant, Fabrizio Di Carlo ("Di Carlo"). The motion was referred to the undersigned by the Honorable Pamela K. Chen on July 13, 2023 for a Report and Recommendation.

       The Court has jurisdiction over this matter under the Securities Act, 15 U.S.C. § 77v(a)

---

[1] Citations to "Compl." refer to plaintiff's Complaint filed on September 27, 2022 (ECF No. 1).

and the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa.  The Eastern District of New York is the proper venue for this action because several individuals residing in the District purchased the stock at issue during the relevant period, and Charlie Abujudeh ("Abujudeh"), a member of the schemes who was sued by the SEC in a separate action, made payments to an entity located in the Eastern District on behalf of, and in furtherance of, the schemes.  (See Compl. ¶ 17).

For the reasons stated below, it is respectfully recommended that the plaintiff's motion be granted in part and denied in part, and that a default judgment be entered against defendant Di Carlo.

## FACTUAL BACKGROUND

Defendant Di Carlo is alleged to have participated in a scheme for the fraudulent sale of Odyssey stock.  Odyssey was a publicly traded Nevada company during the relevant period. (Compl. ¶ 36).  Plaintiff alleges that in 2019, defendants Nicosia and Reininger, along with Abujudeh, created a plan for Abujudeh to purchase 2.5 million shares of Odyssey stock, and then after funding stock promotional campaigns to generate demand, sell the stock and split the profits.  (Id. ¶ 37).  Plaintiff alleges that all three individuals, the "Odyssey Control Group," were affiliates of Odyssey, owning significant shares, and Nicosia and Reininger were also involved in the management of Odyssey.  (Id. ¶ 38).

Plaintiff alleges that defendant Touchard, a "long-time associate of Abujudeh," identified Di Carlo as a candidate for stock promotion.  (Id. ¶ 41).  Plaintiff alleges that Di Carlo assisted in preparing four press releases which Odyssey issued in January and February of 2020.  (Id. ¶ 43). Plaintiff also alleges that Di Carlo and the promoters that worked for him "cold called potential investors and claimed they worked for an entity called 'Investor's Quarterly' ('IQ'), and employed high-pressure, deceptive sales tactics."  (Id. ¶ 46).  The Complaint details the

experiences of two investors who were convinced to purchase Odyssey shares by members of Di Carlo's phone room, and lost thousands of dollars as a result. (Id. ¶¶ 47-55).

Plaintiff alleges that Di Carlo's stock promotors never told the investors the following material information: "that they were hired by Odyssey insiders who controlled the company (the Odyssey Control Group); that the Odyssey Control Group controlled nearly all of the shares that could be publicly traded; that the Odyssey Control Group was selling their Odyssey shares into the promotion and splitting the profits; and that the Odyssey Control Group was paying them 30 percent commission on every share they sold through the promoters." (Compl. ¶¶ 56-57).

Abujudeh allegedly wire transferred portions of the proceeds generated by Di Carlo and his promoters to a bank account for which Di Carlo was sole authorized signatory. (Id. ¶ 58). Di Carlo was ultimately fired for not generating a sufficient volume of purchases. (Id. ¶¶ 61-63).

The Complaint, filed on September 27, 2022, asserts two claims against Di Carlo. The first is a claim of fraud in the offer or sale of securities, in violation of 15 U.S.C. § 77q(a)(1) and (3). (Id. ¶¶ 119-122). The second is a claim of fraud in connection with the purchase or sale of securities in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a) and (c). (Id. ¶¶ 123-126).

When defendant Di Carlo failed to answer or otherwise respond to the Complaint filed by the SEC, the Clerk of the Court entered a default against him on May 26, 2023. The SEC now moves for default judgment against Di Carlo, seeking "(1) permanent injunctions against future securities fraud violations; (2) disgorgement of ill-gotten gains with prejudgment interest; (3) a civil monetary penalty; and (4) a penny stock bar." (Pl.'s Mem.[2] at 2).

On December 19, 2023, the Court was notified by plaintiff that Di Carlo commenced an

---

[2] Citations to "Pl.'s Mem." refer to plaintiff's Memorandum in Support of Plaintiff's Application for Default Judgment Against Defendant Fabrizio Di Carlo, filed on July 13, 2023 (ECF No. 29-1).

assignment for the general benefit of creditors under the Canadian Bankruptcy and Insolvency Act. (ECF No. 33). However, such action does not require a stay in this case since Di Carlo has not sought to enforce the proceeding under the United States Bankruptcy Code, and since bankruptcy courts "may not enjoin a police or regulatory act of a governmental unit." 11 U.S.C. §§ 1519(d), 1521(d).

## DISCUSSION

A. <u>Default Judgment Standard</u>

Rule 55(a) of the Federal Rules of Civil Procedure provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Rule 55 sets forth a two-step process for an entry of default judgment. <u>See</u> <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d 90, 95-96 (2d Cir. 1993). First, the Clerk of Court enters the default pursuant to Rule 55(a) by notation of the party's default on the Clerk's record of the case. <u>Id.</u> Second, after the Clerk of Court enters a default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the court may enter a default judgment. <u>See</u> Fed. R. Civ. P. 55(b).

The Second Circuit has cautioned that since a default judgment is an "extreme sanction[,]" it should only be entered as a last resort. <u>See</u> <u>Meehan v. Snow</u>, 652 F.2d 274, 277 (2d Cir. 1981). While the Second Circuit has recognized the "push on a trial court to dispose of cases that, in disregard of the rules, are not processed expeditiously [and] . . . delay and clog its calendar," it has held that the district court must balance that interest with its responsibility to "afford[] litigants a reasonable chance to be heard." <u>Enron Oil Corp. v. Diakuhara</u>, 10 F.3d at 95-96. Thus, considering the "oft-stated preference for resolving disputes on the merits[,]"

4

default judgments are "generally disfavored[,]" and doubts should be resolved in favor of the defaulting party. Id.  Accordingly, plaintiffs are not entitled to a default judgment as a matter of right simply because a party is in default.  See Erwin DeMarino Trucking Co. v. Jackson, 838 F. Supp. 160, 162 (S.D.N.Y. 1993) (noting that courts must "supervise default judgments with extreme care to avoid miscarriages of justice").

The Court has significant discretion to consider a number of factors in deciding whether to grant a default judgment, including: (1) whether the grounds for default are clearly established; (2) whether the claims were pleaded in the complaint, thereby placing the defendants on notice, see Fed. R. Civ. P. 54(c) (stating a "default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings"); King v. STL Consulting LLC, No. 05 CV 2719, 2006 WL 3335115, at *4-5 (E.D.N.Y. Oct. 3, 2006) (holding that Rule 54(c) is not violated in awarding damages that accrued during the pendency of a litigation, so long as the complaint put the defendant on notice that the plaintiff may seek such damages); and (3) the amount of money potentially involved—the more money involved, the less justification for entering the default judgment.  Hirsch v. Innovation Int'l, Inc., No. 91 CV 4130, 1992 WL 316143, at *2 (S.D.N.Y. Oct. 19, 1992).  Additionally, the Court may consider whether material issues of fact remain, whether the facts alleged in the complaint state a valid cause of action, whether plaintiffs have been substantially prejudiced by the delay involved, and whether the default judgment might have a harsh effect on the defendants.  See Pacific M. Int'l Corp. v. Raman Int'l Gems, Ltd., 888 F. Supp. 2d 385, 393 (S.D.N.Y. 2012).

The burden is on the plaintiffs to establish their entitlement to recovery.  See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993).  When a default judgment is entered, the defendants are deemed to have

admitted all well-pleaded allegations in the complaint pertaining to liability.  See id.  For the purposes of an inquest, a court accepts as true all factual allegations in the complaint, except those claims relating to damages.  See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

    B.  Default Determination

In this case, it is beyond dispute that defendant Di Carlo is in default.  Defendant Di Carlo has failed to file an Answer to the Complaint, failed to oppose plaintiff's motion for a default judgment, and failed to challenge the Court's entry of a default.  See Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *2 (observing that "[the defendant's] default is crystal clear—it does not even oppose this motion").  While a defaulting defendant admits all well-pleaded factual allegations apart from those relating to damages, it remains incumbent on the Court to review the allegations in the complaint to determine if plaintiff has met the burden to ensure the elements of each claim have been pleaded adequately.  See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d at 65.

    C.  Securities Fraud

Plaintiff alleges that Di Carlo violated 15 U.S.C. § 77q(a)(1) and (3), 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a) and (c).

Sections 77q(a)(1) and (3) of Title 15, United States Code, make it unlawful in the sale of securities to "employ any device, scheme, or artifice to defraud" or to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."  Section 78j(b) of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal Regulations, similarly "prohibit making any material misstatement or

6

omission in connection with the purchase or sale of any security." Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014).

In order to establish liability under 15 U.S.C. § 78j(b), the SEC must show that the defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak. . .; (2) with scienter; (3) in connection with the purchase or sale of securities." See Securities Exch. Comm'n v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999) (citing Securities Exch. Comm'n v. First Jersey Securities, Inc., 101 F.3d 1450, 1467 (2d Cir. 1996)).  A claim under 15 U.S.C. § 77q(a)(1) and (3) requires "[e]ssentially the same elements. . . . though no showing of scienter is required." Id.

A misrepresentation is "'material' 'if there is a substantial likelihood that a reasonable investor would consider it important in deciding how to invest.'" Securities Exch. Comm'n v. Mayhew, 121 F.3d 44, 51 (2d Cir. 1997) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988)) (internal citations, quotation marks, and brackets omitted)).  This does not mean, however, that a reasonable investor "would necessarily change his investment decision based on the information, as long as a reasonable investor would have viewed it as significantly altering the 'total mix' of information available." Id. at 52 (citing TSC Indus. v. Northway, 426 U.S. 438, 449 (1976); Flynn v. Bass Bros. Enters., 744 F.2d 978, 985 (3d Cir. 1984)).  Thus, material facts include those "which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities" and any fact that, "in reasonable and objective contemplation[,] might affect the value of the corporation's stock or securities." Id. (quoting Securities Exch. Comm'n v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) (internal quotations omitted)).  Non-disclosure of a "beneficial interest in

7

promoted stock and a present intent to sell" has been found to be a material omission. Sec. & Exch. Comm'n v. Fiore, 416 F. Supp. 3d 306, 323 (S.D.N.Y. 2019).

Scienter is a "mental state embracing intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). The Second Circuit has held that a plaintiff may establish scienter by proof of a defendant's "conscious misbehavior or recklessness[.]" In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 74 (2d Cir. 2001); Securities Exch. Comm'n v. United States Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998); Sirota v. Solitron Devices, Inc., 673 F.2d 566, 573 (2d Cir. 1982). "Representing information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter." Securities Exch. Comm'n v. Universal Express, Inc., 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007), aff'd sub nom. Securities Exch. Comm'n v. Altomare, 300 Fed. App'x 70 (2d Cir. 2008) (citing Rolf v. Blyth, 570 F.2d 38, 48 (2d Cir. 1978)). Circumstantial evidence, such as where "defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor," can also support an inference of scienter. Sec. & Exch. Comm'n v. Fiore, 416 F. Supp. 3d at 324 (internal citations omitted).

The "in connection with" requirement is satisfied if the misrepresentation "coincides" with a securities transaction. Securities Exch. Comm'n v. Zandford, 535 U.S. 813, 822-24 (2002); Superintendent of Ins. of the State of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, 12-13 (1971).

Each of these elements is satisfied in this case and a default judgment is therefore warranted. The Complaint clearly alleges that Di Carlo and individuals he hired used deceptive methods to pitch Odyssey stock to prospective investors. (Compl. ¶¶ 41-46). The alleged misrepresentations by Di Carlo's phone room include a comment to Investor 1 that "he would likely grow his retirement savings over the next four months to about a quarter million dollars," and an email to Investor 2 that stated, "we believe the shares of the ODYY [the stock ticker symbol for Odyssey] will double in value prior to the end of the calendar year." (Id. ¶¶ 48, 52). Plaintiff also alleges that one stock promoter "falsely claimed that he worked for the broker-dealer where Investor 1 held his retirement investments." (Id. ¶ 47). Furthermore, Di Carlo's stock promotors did not disclose that they were receiving commission on their sales or that the Odyssey Control Group, which controlled almost all publicly traded shares of Odyssey, were "selling their shares into the promotion and splitting the profits." (Id. ¶ 56). Investors 1 and 2 appear to have relied on these material misrepresentations and omissions. (Id. ¶¶ 47-55). Plaintiff sufficiently alleges scienter through Di Carlo's engagement in and benefit from the alleged fraud, his knowledge of and control over the methods of his promoters, and his suggestion of other phone rooms that could "deliver the goods" upon his firing. (Id. ¶¶ 42-45, 58, 59). Moreover, Di Carlo's fraud was committed in connection with the purchase and sale of stock.

In addition, unlike those instances where courts have been hesitant to enter default judgment because there were potentially millions of dollars at stake, the amount of money involved in this case—the SEC's request for disgorgement and prejudgment interest of $43,970.53 and a civil penalty of $100,000—is not significant. Cf. Hirsch v. Innovation Int'l, Inc., 1992 WL 316143, at *2 (declining to enter default judgment, in part because plaintiff's

9

damages request ran "well into the millions of dollars," and giving defendant an opportunity to contest the entry of default).

Thus, given the well-pleaded allegations, the Court finds that default judgment is appropriate in this case.

D. Relief Sought

Having determined that plaintiff's Complaint sufficiently alleges facts that establish Di Carlo's liability for violations of the securities laws and that a default judgment is appropriate in this matter, the Court now turns to the specific relief that the SEC seeks: (1) permanent injunctive relief, (2) disgorgement and prejudgment interest, (3) a civil penalty of $100,000, and (4) a bar from participating in penny stock offerings.

1. Permanent Injunction

Plaintiff requests a permanent injunction against Di Carlo for future securities fraud violations. (See Pl.'s Mem. at 9-11).

"Permanent injunctive relief is appropriate where a defendant has violated securities laws and there is a reasonable likelihood that [it] will do so again." Securities Exch. Comm'n v. Carrillo Huettel LLP, No. 13 CV 1735, 2017 WL 213067, at *6 (S.D.N.Y. Jan. 17, 2017), report and recommendation adopted, 2017 WL 1162199 (S.D.N.Y. Mar. 28, 2017) (citing Securities Exch. Comm'n v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99-100); 15 U.S.C. § 78u(d)(1) (stating that district courts "shall" impose injunctions as a consequence of violations of the securities laws "upon a proper showing"). In determining the likelihood of future violations, courts consider

> the fact that defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an "isolated occurrence;" whether defendant continues to maintain that [its] past

> conduct was blameless; and whether . . . the defendant might be in a position where future violations could be anticipated.

Securities Exch. Comm'n v. Commonwealth Chem. Sec., Inc., 574 F.2d at 100 (quoting id., 410 F. Supp. 1002, 1020 (citing Securities Exch. Comm'n v. Universal Major Indus. Corp., No. 73 CV 3626, 1975 WL 400, at *20 (S.D.N.Y. July 14, 1975), aff'd 546 F.2d 1044 (2d Cir. 1976))); see also Securities and Exchange Comm'n v. Carrillo Huettel LLP, 2017 WL 213067, at *6. The court may assess these factors using the facts alleged in a well-pleaded complaint. See, e.g., Securities Exch. Comm'n v. Syndicated Food Servs. Int'l, Inc., No. 04 CV 1303, 2010 WL 4668777, at *1-2 (E.D.N.Y. Nov. 9, 2010); see also Securities Exch. Comm'n v. Rinfret, No. 19 CV 6037, 2020 WL 6559411, at *5 (S.D.N.Y. Nov. 9, 2020) (granting injunctive relief on a default judgment motion based on "the Commission's allegations, taken as true").

The SEC claims that each of the relevant factors favors entry of a permanent injunction against Di Carlo. (Pl.'s Mem. at 10). It argues that Di Carlo had a high degree of scienter since he "solicited investors directly and oversaw the work of his agents soliciting investors," and he "understood the deceptive methods by which they were pitching Odyssey." (Id.) The SEC states that the conduct was "not isolated" since Di Carlo was identified by Touchard as someone who ran an existing stock promotion organization and could assist with the pump-and-dump scheme. (Id. at 11). Upon being fired for not generating a sufficient volume of sales, Di Carlo offered to connect Abujudeh to other phone rooms that could "deliver the goods," demonstrating "ongoing involvement in and contacts within the penny stock promotion industry." (Id.) Additionally, Di Carlo has failed to appear in this action. Thus, he has not indicated any recognition of his wrongful conduct. (Id.)

It is unclear whether Di Carlo continues to run a penny stock promotion organization, particularly in light of his ongoing bankruptcy proceedings. Nevertheless, the balance of the

11

facts alleged in the Complaint warrant issuing a permanent injunction here for the reasons articulated by the SEC.  Di Carlo's liability is not only clear, but he also failed to take responsibility for his misconduct.  Moreover, Di Carlos acted with a high level of scienter, and is evidenced to have connections within the penny stock promotion industry and thus is in a position to and has indicated an intent to commit future violations or at least maintain his contacts in the industry.  (Compl. ¶ 59).

Therefore, this Court respectfully recommends that the District Court enter a permanent injunction, enjoining Di Carlo from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

    2.  Disgorgement and Prejudgment Interest

Plaintiff requests a disgorgement award of the $38,198 that Di Carlo earned in commissions from the illegal sales of Odyssey stock, plus prejudgment interest on this amount totaling $5,772.53.  (Pl.'s Mem. at 11-14).  In support of this request, plaintiff has provided a calculation of prejudgment interest from March 2020 through June 2023 "using the standard calculation tool established by the Commission, which applies the applicable quarterly interest rate used by the Internal Revenue Service for underpayments, and which compounds interest quarterly."  (D'Addio Decl.[3] ¶ 8, Ex. 3).

"[A] disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under [15 U.S.C.] § 78u(d)(5)."  Liu v. Securities Exch. Comm'n, 140 S. Ct. 1936, 1940, (2020).  Section 78u(d)(7) also states that "[i]n any

---

[3] Citations to "D'Addio Decl." refer to the Declaration of David J. D'Addio in Support of Plaintiff's Motion for Default Judgment as to Defendant Fabrizio Di Carlo dated July 13, 2023 (ECF No. 30).

action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement."

"In general, '[t]he amount of disgorgement ordered need only be a reasonable approximation of profits causally connected to the violation.' If the disgorgement amount is generally reasonable, 'any risk of uncertainty' about the amount 'fall[s] on the wrongdoer whose illegal conduct created that uncertainty.'" Securities Exch. Comm'n v. Fowler, 6 F.4th 255, 267 (2d Cir. 2021) (quoting Securities Exch. Comm'n v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013)) (internal citations omitted). "The Second Circuit has upheld the disgorgement of all profits received, even though a portion of those profits were later transferred to another party, explicitly rejecting an 'actual profits' approach." Securities Exch. Comm'n v. Tourre, 4 F. Supp. 3d 579, 590 (S.D.N.Y. 2014). Additionally, "[t]he Court has discretion to order payment of prejudgment interest on any disgorged gains," in order to account for the time value of money. Securities Exch. Comm'n v. Rinfret, 2020 WL 6559411, at *6.

In this case, plaintiff has alleged that Di Carlo received $38,198 in total commissions from illegal sales of Odyssey stock. (Pl.'s Mem. at 13 (citing Compl. ¶ 58)). Specifically, the Complaint lists the dates and amounts of three alleged wire transfers from Abujudeh to Di Carlo: (1) $5,898 on January 30, 2020; (2) $20,200 on February 4, 2020; and (3) $12,100 on February 10, 2020. (Compl. ¶ 58). However, plaintiff has not provided any records or account statements as evidence of the three alleged wire transfers. Plaintiff has also offered no explanation for the lack of evidence provided. Even though disgorgement amounts need only be a reasonable approximation of profits, proper evidentiary support is still required. See, e.g., Securities Exch. Comm'n v. China Energy Sav. Tech., Inc., No. 06 CV 6402, 2008 WL 6572372, at *12

13

(E.D.N.Y. Mar. 28, 2008); Securities Exch. Comm'n v. World Info. Tech., Inc., 590 F. Supp. 2d 574, 577 (S.D.N.Y. 2008).

Therefore, it is respectfully recommended that the request for disgorgement and corresponding prejudgment interest be denied without prejudice to renew upon the presentation of additional evidence.

    3. Civil Penalty

The federal securities laws permit courts to impose civil penalties for securities violations based on a three-tiered system. See 15 U.S.C. § 78u(d)(3)(B). A first-tier penalty is appropriate for any violation; a second-tier penalty is appropriate for a violation that involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement[;]" and a third-tier penalty may be imposed if, in addition to the requirements for a second-tier penalty, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." Id.

For natural persons, the maximum penalties are the greater of "the gross amount of pecuniary gain to such defendant as a result of the violation" or the following tiered amounts: $11,524 for first-tier penalties; $115,231 for second-tier penalties; and $230,464 for third-tier penalties. Id.; 17 C.F.R. § 201.1001; United States Securities and Exchange Commission, Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2024), (Jan. 15, 2024), https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm (listing the applicable penalty amounts as adjusted for inflation).

The Court has discretion to set the actual amount of the penalty within the applicable statutory limit. Securities Exch. Comm'n v. Razmilovic, 738 F.3d 14, 38 (2d Cir. 2013);

14

Securities Exch. Comm'n v. Kern, 425 F.3d 143, 153 (2d Cir. 2005).  The factors that courts may consider in exercising this discretion include:

> the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

Securities Exch. Comm'n v. Lybrand, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003).  By allowing such civil penalties, "Congress sought to achieve the dual goals of punishment of the individual violator and deterrence of future violations."  Securities Exch. Comm'n v. Moran, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (quoting H.R. Rep. No. 101–616, 101st Cong., 2d Sess., reprinted in 1990 U.S. Code Cong. & Admin. News 1379, 1384-86).  Moreover, as with determining the propriety of injunctive relief, the Court can base its determination on the well-pleaded allegations contained in the plaintiff's complaint.  See, e.g., Securities Exch. Comm'n v. Rinfret, 2020 WL 6559411, at *7; Securities Exch. Comm'n v. Weber, No. 18 CV 5019, 2020 WL 6798917, at *7 (E.D.N.Y. May 26, 2020).

The SEC argues that Di Carlo "knowingly engaged in fraudulent conduct that targeted unsophisticated retail investors, caused actual investor losses, and created a significant risk of further substantial investor losses."  (Pl.'s Mem. at 15).  Di Carlo has also failed to appear and not accepted responsibility or cooperated with the SEC's investigation.  (Id. at 15-16).

Although the Court is authorized to penalize Di Carlo in an amount up to $230,464, the SEC asks that this Court impose a penalty of only $100,000 because "the duration of Di Carlo's charged conduct was relatively short and the totality of his ill-gotten earnings relatively modest."  (Id. at 16).  Even considering Di Carlo's bankruptcy proceedings, a $100,000 penalty is

15

reasonable given the facts as articulated by the SEC, and thus, this Court respectfully recommends that the District Court impose a penalty in that amount.

    4. <u>Bar from Participating in Penny Stock Offerings</u>

Plaintiff requests that the Court bar Di Carlo from participating in penny stock offerings. (Pl.'s Mem. at 16-18).

Pursuant to Sections 77t(g) and 78u(d)(6) of Title 15, United States Code, a court may prohibit a person "from participating in an offering of penny stock, conditionally or unconditionally, and permanently or for such period of time as the court shall determine" if they were participating in the offering of penny stock at the time of their alleged misconduct. "The standard for imposing such a bar essentially mirrors that for imposing an officer-or-director bar." <u>Securities Exch. Comm'n v. Universal Exp.</u>, Inc., 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007), <u>aff'd sub nom.</u> <u>Securities Exch. Comm'n v. Altomare</u>, 300 F. App'x 70 (2d Cir. 2008). Under the standard for imposing an officer-or-director bar, courts consider: "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." <u>Securities Exch. Comm'n v. Bankosky</u>, 716 F.3d 45, 48 (2d Cir. 2013) (citing <u>Securities Exch. Comm'n v. Patel</u>, 61 F.3d 137, 141 (2d Cir. 1995)).

Plaintiff has sufficiently alleged that Odyssey was a "penny stock" at the time of Di Carlo's involvement in its promotion. (<u>See</u> Pl.'s Mem. at 17 (citing Compl. ¶¶ 34, 40, 48, 50, 51, 53, 55)). Plaintiff has also sufficiently alleged that Di Carlo participated in offering such stock. (<u>See</u> <u>id.</u> (citing Compl. ¶¶ 4-6, 39-64)). There is no allegation that Di Carlo is a repeat offender. However, it is alleged that he ran a stock promotion organization that pre-existed the

16

scheme at issue and there is evidence that he is well-connected within the penny stock promotion industry. (Compl. ¶¶ 3-4, 59). As noted supra, he acted with a high degree of scienter. He also had significant economic stake in the violation. (Id. ¶ 41).

Therefore, this Court respectfully recommends that the District Court permanently bar Di Carlo from participating in penny stock offerings.

## CONCLUSION

For the aforementioned reasons, this Court respectfully recommends that the SEC's motion for default judgment be granted in part and denied in part. The Court recommends that Di Carlo be permanently enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; that a civil penalty in the amount of $100,000 be imposed; and that he be barred from participating in penny stock offerings. The Court further recommends that the SEC's request for disgorgement and prejudgment interest be denied without prejudice to the SEC presenting further evidence of defendant's profits.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); see also Fed. R. Civ. P. 6(a) (providing the method for computing time). Failure to file objections within the specified time waives the right to appeal the District Court's order. See, e.g., Caidor v. Onondaga Cty., 517 F.3d 601, 604 (2d Cir. 2008) (explaining that "failure to object timely to a . . . report [and recommendation] operates as a waiver of any further judicial review of the magistrate [judge's] decision").

The SEC is Ordered to serve this Report and Recommendation on defendant Di Carlo and file an affidavit of service through the Electronic Case Filing system immediately.

**SO ORDERED.**

Dated: Brooklyn, New York
February 26, 2024

/s/ Cheryl L. Pollak
Cheryl L. Pollak
Chief United States Magistrate Judge
Eastern District of New York